**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DTCC DATA REPOSITORY (U.S.) LLC, <br> 55 Water Street <br> New York, NY 10041-0099 <br><br> and <br><br> THE DEPOSITORY TRUST & CLEARING CORPORATION, <br> 55 Water Street <br> New York, NY 10041-0099 <br><br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES COMMODITY FUTURES TRADING COMMISSION, <br> 3 Lafayette Centre <br> 1155 21st Street, N.W. <br> Washington, D.C. 20581 <br><br> *Defendant*. | Case No. _____ |

**COMPLAINT**

DTCC Data Repository (U.S.) LLC ("DDR") and The Depository Trust & Clearing Corporation ("DTCC") state upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1.      This case challenges three interrelated actions by the Commodity Futures Trading Commission.   The first was the Commission's reversal of its published pro-competitive statements regarding its cleared swap data reporting rules.   The second was its administrative

action approving a new Rule 1001 of the Chicago Mercantile Exchange, Inc., which imposes anti-competitive data reporting requirements that the Commission had barred in its earlier statements.  The third was its approval by inaction of a similar ICE Clear Credit rule.

2.       Under the guise of these actions, the Commission made substantive changes to its regulations.  As a consequence, two large swap clearinghouses have Commission-approved rules requiring that the official reports of transactions cleared by such clearinghouses be reported to their captive swap data repositories.

3.       Two Commissioners wrote separate opinions in connection with the Commission's approval of Rule 1001 of the Chicago Mercantile Exchange, Inc., raising objections to the process followed by the Commission.  One stated that the approval constituted "a complete reinterpretation" of CFTC rules, and that "[t]he action taken by the Commission today falls well short of the standards by which a federal agency should regulate an industry."

4.       The concern that the Commission's actions completely changed the CFTC's final rules is valid, as the challenged actions violate the Administrative Procedure Act and the Commodity Exchange Act.

## OVERVIEW

5.       The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank"), amended the Commodity Exchange Act, 7 U.S.C. §§ 1-27f.  Dodd-Frank established a new, more transparent and robust compliance regime for swap transaction execution, clearing, and data reporting.  For the first time, Congress required the reporting of swap trades to swap data repositories ("SDRs") in order to enhance the transparency and regulatory oversight of the swap markets.

6.      In implementing its swap data reporting rules, the Commodity Futures Trading Commission ("CFTC" or "Commission") originally adhered to Congress' mandate and finalized rules that called for all data for a given transaction to be reported to a single SDR—that is, the SDR to which the initial report of swap data is made.   The Commission noted (and commentators agreed) that single SDR reporting was essential to prevent fragmentation of data across multiple SDRs, which would seriously impair the ability of regulators to view or aggregate all data concerning a swap and the ability of reporting entities and counterparties to review data they report.

7.      A derivatives clearing organization ("DCO") is a clearinghouse that enables parties to a derivatives transaction to substitute, through novation or otherwise, the credit of the DCO for the credit of the parties.   A swap must be cleared by a DCO if the Commission finds that the swap—or group, category, type, or class of swap—is required to be cleared, unless an exception applies.

8.      Dodd-Frank's core principles for DCOs, as well as other provisions in the Commodity Exchange Act, forbid unreasonable trade restraints and anti-competitive activities in trading, clearing, and data reporting of transactions in the swaps markets.   The Commodity Exchange Act requires that the Commission "endeavor to take the least anti-competitive means" in implementing the statute, issuing any order, or adopting any regulation.

9.      During the initial period of implementation of Dodd-Frank, the Commission adhered to the Commodity Exchange Act's pro-competitive core principles and mandates.

a.      In September 2011, the Commission promulgated rules that implemented registration requirements, statutory duties, core principles, and certain compliance obligations for registered SDRs (the "Part 49 rules").

3

b.      In November 2011, the CFTC promulgated rules regarding DCO general provisions and core principles (the "Part 39 rules").

c.      In January 2012, the Commission promulgated rules to promote transparency for swap data reporting (the "Part 43 rules" and the "Part 45 rules").

10.     A key purpose of all of these rules is to ensure, consistent with the Commodity Exchange Act's core principles, a competitive marketplace for reporting swap data. The preamble to the Part 45 rules provides that:

> [R]equiring that all cleared swaps be reported only to DCOs registered as SDRs or to SDRs chosen by a DCO would create a non-level playing field for competition between DCO-SDRs and non-DCO-SDRs . . . it would make DCOs collectively, and could in time make a single DCO-SDR, the sole recipient of data reported concerning cleared swaps.

11.     On or about October 11, 2012, the Commission issued a series of Frequently Asked Questions ("FAQs"), which stated that:

> Market participants may choose to use a [designated contract market's], [swap execution facility's] or DCO's SDR for reporting swap transactions, but a [designated contract market], [swap execution facility] or DCO as part of its offering of trading or clearing services cannot require that market participants use its affiliated or "captive" SDR for reporting.

12.     The Commission reversed its commitment to these pro-competitive principles after the November 8, 2012 filing of a complaint in this Court by the Chicago Mercantile Exchange, Inc. ("CME") challenging the Commission's implementation of the swap data reporting regime for cleared swaps and its restrictions on anti-competitive behavior by DCOs that operate affiliated or captive SDRs.  This regime had been in place for nearly twelve months.

13.     CME's complaint alleged that CFTC staff had taken the position that CME must amend its pending SDR application, which was predicated on CME requiring the reporting of

swap transactions cleared at CME to its affiliated SDR, "to show compliance with the FAQ before Staff will recommend approving the application."

14.     On or about November 9, 2012, CME submitted proposed Rule 1001 ("CME Rule 1001") to the Commission.  As later technically amended, it provided that data for trades cleared on its DCO shall be reported to its captive SDR:

> For all swaps cleared by the [CME] Clearing House, and resulting positions, the [CME] Clearing House shall report creation and continuation data to CME's swap data repository for purposes of complying with applicable CFTC rules governing the regulatory reporting of swaps.  Upon the request of a counterparty to a swap cleared at the Clearing House, the Clearing House shall provide the same creation and continuation data to a swap data repository selected by the counterparty as the [CME] Clearing House provided to CME's swap data repository under the preceding sentence.

15.     DTCC, DDR, and eleven other parties (representing a broad spectrum of participants in the swap markets, including end-users, energy companies, institutional investors, industry trade associations, swap dealers and inter-dealer brokers) filed comments opposing CME Rule 1001, and CME, the IntercontinentalExchange, Inc. ("ICE"), and three other parties filed comments favoring the rule.

16.     Since the filing of CME's lawsuit, the Commission has been acting in a manner contrary to its own rules and regulations, departing from and violating the Commodity Exchange Act's pro-competitive core principles and mandates.

17.     CME voluntarily dismissed its case against the Commission on or about November 29, 2012.  One day before that, the CFTC withdrew its FAQs, which had explicitly forbidden DCOs, such as CME, from requiring that all swaps cleared by a DCO be reported to its affiliated or captive SDR.  One week earlier, the CFTC had provisionally approved CME's SDR application.  (The Commission's withdrawal of the FAQs is attached as Annex A.)

18.   On March 6, 2013, the Commission approved CME Rule 1001.   The Commission's order approving CME Rule 1001 and its accompanying explanatory statement state that they supersede several portions of the FAQs, including that portion quoted in paragraph 11 of this Complaint.   The Commission's order does not mention the CME lawsuit. (The Commission's March 6, 2013 order is attached as Annex B.)

19.   The Commission's abrupt withdrawal of the FAQs and its approval of CME Rule 1001 with the accompanying explanatory statement violate the Administrative Procedure Act and the Commodity Exchange Act for, among other reasons:

a.   The FAQs, summarily withdrawn without explanation on the day before CME dismissed its lawsuit, were superseded in disregard of the notice and comment requirements of the Administrative Procedure Act and of the cost-benefit analysis requirements of the Commodity Exchange Act;

b.   Approval of CME Rule 1001 was inconsistent with Dodd-Frank, the Commodity Exchange Act, the Commission's implementing rules, and the Commission's published FAQs;

c.   Approval of CME Rule 1001 was inconsistent with section 45.10 of the Commission's regulations because CME Rule 1001 violates the single SDR requirement of Dodd-Frank by allowing CME's DCO to report data related to a cleared swap to a different SDR than the SDR to which the initial report of swap data was made;

d.   To the limited extent the Commission addressed its pro-competitive statutory mandates in its review of CME Rule 1001, it wrongly defined the relevant markets and it made other fundamental errors that violate the pro-competitive provisions of the Commodity Exchange Act;

      e.     The Commission used pretexts contrary to law to justify not conducting the cost-benefit analysis, which it was required to conduct with respect to CME Rule 1001, in order to comply with the Commodity Exchange Act; and

      f.     The Commission used pretexts contrary to law to justify not conducting the full notice and comment rulemaking, which it was required to conduct with respect to CME Rule 1001 in order to comply with the Administrative Procedure Act.

      20.     After the Commission's rules were finalized in early 2012, DTCC and DDR, as well as their market participant-owners, spent millions of dollars to establish an SDR that would provide necessary transparency into the swap markets for the public and global regulators, including the CFTC, in reliance on the Commission's duly promulgated rules and published definitive guidance.  Additionally, in developing an SDR, DTCC and DDR worked with financial market participants to establish connectivity and reporting protocols to be operational in advance of the commencement of reporting on October 12, 2012.

      21.     The Commission's summary withdrawal of its October 11, 2012 FAQs and its March 6, 2013 order approving CME Rule 1001, with its declaration that the order "supersedes" the FAQs, have directly affected and injured, continue to directly affect and injure, and will continue to cause additional injury to DTCC and DDR, and their investment in an SDR.  The challenged actions have also directly affected and injured, continue to directly affect and injure, and will continue to cause additional injury to DTCC's and DDR's market participant-owners.

      22.     The certification of ICE Clear Credit's similar "captive SDR" Rule 211 on April 25, 2013 ("ICE Rule 211") and the Commission's denial by inaction of DTCC's and DDR's petition to stay ICE Clear Credit's self-certification have directly affected and injured, continue to directly affect and injure, and will continue to cause additional injury to DTCC and DDR, and

their market participant-owners, and are further violations of the Commodity Exchange Act and the Administrative Procedure Act. Furthermore, it was arbitrary and capricious for the Commission to accept at face value ICE Clear Credit's representation that its captive SDR rule would not have any material anti-competitive effect.

23.     The purported availability of secondary reports as provided in CME Rule 1001 and ICE Rule 211 does not eliminate DDR's and DTCC's past and continuing injuries.

## PARTIES

24.     Plaintiff DDR, a wholly owned, indirect subsidiary of DTCC, is a New York limited liability company. The CFTC granted DDR provisional registration as an SDR on September 19, 2012.

25.     Plaintiff DTCC is incorporated in New York State, with its headquarters in New York City. DTCC provides critical infrastructure to serve participants in the financial industry, including investors, commercial end-users, broker-dealers, banks, insurance carriers, and mutual funds. DTCC operates as a cooperative, owned collectively by its users and governed by a diverse board of directors. DTCC's governance structure includes 344 shareholders.

26.     DTCC has been engaged with global regulators and its market participant-owners since 2006 in an effort to build an effective global public utility to contain all information on derivative transactions of market participants that would be capable of providing a complete and accurate picture of the distribution of risk in the financial system. Limiting the scope of data available to DDR will harm the development of this public utility.

27.     Defendant Commodity Futures Trading Commission is an agency of the United States Government. It is charged with administering the Commodity Exchange Act and its actions are subject to the Administrative Procedure Act.

## JURISDICTION AND VENUE

28.     This action presents federal questions under the Administrative Procedure Act and the Commodity Exchange Act.  Therefore, this Court has jurisdiction over this action under 28 U.S.C. § 1331.  This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201.

29.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this action is against an agency of the United States that is located in the District of Columbia.  Further, venue is proper in this Court because a substantial part of the acts or omissions giving rise to this action occurred in the District of Columbia.

## FACTUAL BACKGROUND

### I.      DODD-FRANK ACT AND REGULATORY BACKGROUND

#### A.     *Swaps and the Global Financial Crisis*

30.     Swaps include a broad variety of derivative transactions and are defined in section 1a(47) of the Commodity Exchange Act.  Prior to the enactment of Dodd-Frank, these products were largely unregulated in the United States.

31.     Dodd-Frank brought comprehensive reform to the regulation of swaps and amended the Commodity Exchange Act to establish a regulatory framework for reporting swap data to SDRs.  A central objective of Dodd-Frank is to promote transparency in the swap markets.

32.     Section 727 of Dodd-Frank (section 2(a) of the Commodity Exchange Act) statutorily mandates (among other things) the reporting by "parties to a swap" of "each swap (whether cleared or uncleared)" to a "registered swap data repository."

33.     Section 728 of Dodd-Frank (section 21 of the Commodity Exchange Act) establishes registration requirements, statutory duties, core principles, and certain compliance obligations for SDRs.

34.     Section 729 of Dodd-Frank (section 4r of the Commodity Exchange Act) establishes additional reporting and recordkeeping requirements for uncleared swaps.

35.     Section 725 of Dodd-Frank (section 5b of the Commodity Exchange Act) establishes registration requirements, statutory duties, core principles, and certain compliance obligations for DCOs.

> B.     *The CFTC Rules and Guidance Regarding SDR Implementation*

36.     After Congress enacted Dodd-Frank, the CFTC conducted rulemakings, in accordance with the Administrative Procedure Act, related to nonpublic regulatory reporting of swap data and real-time public reporting of swap data.

37.     Sections 727 through 729 of Dodd-Frank (sections 2(a), 21, and 4r of the Commodity Exchange Act, respectively) were partially implemented through the CFTC's Parts 43, 45, and 49 rules.  These rules implement Dodd-Frank's mandate to increase the transparency of the swap markets by creating a comprehensive system of reporting cleared and uncleared trades to SDRs.

38.     The Commission's regulations, promulgated after notice and comment and consistent with Dodd-Frank, mandate (among other things) a "level playing field" among participants for swap data reporting services.

39.     On December 8, 2010, the CFTC proposed and invited comments on the Part 45 rules, including section 45.10 of the Commission's regulations (the "single SDR rule").  In the proposed rules for Part 45, the Commission stated that for cleared swaps, all swap data for a

given swap must be reported to the same SDR to which the initial report of swap data is made. The preamble to the proposed rules recognized that, if the initial report of trade data is made to an SDR other than an SDR affiliated with the DCO clearing the swap, the DCO would be required to report confirmation data and continuation data to the SDR receiving the initial report, noting that "the SDR receiving this initial report must transmit its own identity . . . to each counterparty to the swap, to the [swap execution facility] or [designated contract market], if any, on which the swap was executed, and to the DCO, if any, to which the swap is submitted for clearing.  Thereafter, the proposed regulations would require that all data reported for the swap . . . must be reported to that same SDR."

40.      In commenting on the proposed rules for Part 45, CME stated that section 4r of the Commodity Exchange Act did not authorize nonpublic regulatory reporting of cleared swaps to an SDR and that reporting such nonpublic data to an SDR would be redundant.  CME argued that reporting of data for cleared swap transactions should be limited to SDRs registered by the DCOs, or to SDRs chosen by the DCOs.  CME contended that DCOs should not have a reporting obligation to any non-DCO SDR.

41.      On January 13, 2012, the CFTC adopted the Part 45 rules largely as proposed, rejecting CME's comments and promulgating a rule that directly conflicts with CME Rule 1001. In the operation of the single SDR rule, the Commission anticipated that "because the final rule does not require each cleared swap to be reported to an SDR affiliated with the DCO that clears the swap, in some circumstances DCOs may incur some increased costs, relative to an environment in which all cleared swaps must be reported to a DCO–SDR."  The CFTC concluded that "DCOs are eligible to register as SDRs and capitalize on these existing connections," stating that the "competitive market for SDR services will dictate such an outcome

if it is indeed cost-effective." The CFTC noted that the "wide variety of suggestions by commenters concerning who should choose the SDR suggests that no single approach produces the lowest cost for all market participants in all circumstances, and that this decision is best left to the market."

42. In compliance with section 15(a) of the Commodity Exchange Act, the Part 45 rules included a seventeen-page cost-benefit analysis section.

43. Over the ensuing months, the CFTC consistently stated that the Commodity Exchange Act and its regulations stand for single-SDR reporting, open access, counterparty choice regarding SDR reporting, and a prohibition on DCOs requiring that data reports be made to their affiliated or captive SDR.

44. On October 12, 2012, the Part 45 rules, along with the CFTC's and SEC's joint rulemaking defining the terms "swap" and "security-based swap," became effective. Consequently, the Commission began requiring compliance with a comprehensive regulatory regime for cleared and uncleared swaps, requiring swap execution facilities, designated contract markets, DCOs, SDRs, swap dealers, and major swap participants to comply with the Part 45 rules with respect to two asset classes of swaps—credit swaps and interest rate swaps.

45. On the October 12, 2012 implementation date, DDR and other provisionally-registered SDRs were to begin receiving swap transaction reports pursuant to the Commodity Exchange Act and the Commission's regulations, providing a centralized location for trade information.

46. However, because the registration and regulation regime for swap dealers and major swap participants (the counterparties to the trade with reporting obligations) was not yet

finalized, reporting was delayed through the issuance of Commission "no-action" letters to provide relief for those counterparties from their swap data reporting obligations.

47.    Until November 2012, the CFTC repeatedly affirmed that under the Commodity Exchange Act, the CFTC could not allow a DCO, as part of its offering of clearing services, to require that market participants use its affiliated or captive SDR for reporting.

## II.    THE COMMISSION CHANGES DIRECTION

*A.    CME's November 2012 Lawsuit Against the Commission*

48.    CME is a wholly-owned subsidiary of the CME Group, which claims that it is "the world's leading and most diverse derivatives marketplace" and that its clearing subsidiary is "one of the world's leading central counterparty clearing providers."

49.    CME is a CFTC-registered DCO, as well as a designated contract market.  CME operates four exchanges, serving all major asset classes, and provides clearing through CME Clearing and CME ClearPort.

50.    On October 15, 2012, the CFTC granted CME no-action relief, which provided that CME did not have to comply with the Part 45 rules until October 26, 2012.  The CFTC subsequently extended that relief until the close of business on November 13, 2012.

51.    This "no-action relief" allowed CME to avoid reporting transactions cleared through CME to an independent SDR, and delayed transparency for the asset class cleared by CME.  At this time, DDR was accepting and reporting cleared interest rate swap transactions, but was not receiving similar data from CME, even though the counterparties to the initial transactions expected that CME would report the cleared confirmation and continuation data to DDR.

52.     On November 8, 2012, CME filed a lawsuit in this Court against the CFTC, seeking judicial review of and a permanent injunction against the enforcement of the Part 45 rules, which had been finalized in January 2012.  (That case was *Chicago Mercantile Exchange Inc. v. United States Commodity Futures Trading Commission*, No. 1:12-cv-01820.)

53.     CME alleged in its lawsuit that the requirement to report to a non-affiliated SDR imposes costly, cumbersome, or duplicative requirements on CME.  This was similar to the arguments made by CME in its comment letter on the proposed rule.  The CFTC rejected these CME arguments when it finalized the Part 45 rules.

54.     CME also alleged, "CFTC Staff has taken the position that CME must amend its SDR application to show compliance with the FAQ before Staff will recommend approving the application."

55.     On November 21, 2012, the Commission granted the CME SDR provisional registration status, thereby authorizing CME to operate an SDR.

B.     *The Commission's Revocation of Its Frequently Asked Questions*

56.     On October 11, 2012, the Commission published FAQs about the Commodity Exchange Act and the Commission's final rules regarding SDRs.  At the time of issuance, the Commission stated:  "The CFTC is issuing a FAQ document to help market participants better understand how to report cleared swaps, who has the obligation to report and the timing of reporting."

57.     Specifically, the FAQs stated:

> Market participants may choose to use a [designated contract market's], [swap execution facility's] or DCO's SDR for reporting swap transactions, but a [designated contract market], [swap execution facility] or DCO as part of its offering of trading or clearing services cannot require that market participants use its affiliated or "captive" SDR for reporting.

58.     Consistent with Dodd-Frank and the Commission's rules, the FAQs also affirmed that "the selection of the particular SDR to which the swap data is reported for the resulting swaps due to clearing is to be determined by the counterparties to the original swap."

59.     On November 28, 2012, after CME had filed its lawsuit against the CFTC and had requested approval of proposed CME Rule 1001, the Commission withdrew the parts of the FAQs quoted in paragraphs 57 and 58 of this Complaint, plus statements on the operation of the "single SDR rule."  It did so without prior notice, explanation, or request for comment.

60.     On November 29, 2012, the day after the CFTC withdrew the FAQs regarding certain cleared swap reporting requirements and published the proposed CME Rule 1001 for comment, CME voluntarily dismissed its lawsuit against the CFTC.

61.     Until the Commission summarily amended the FAQs, the FAQ answers were consistent with the CFTC's swap data reporting regime established under Dodd-Frank and promulgated in the Part 45 rules: a registered entity offering SDR services was not allowed to require that data for swaps cleared by the particular DCO be reported to its affiliated SDR.  The CFTC did not seek public comment on its reversal of the FAQs, thus denying market participants the benefit of administrative procedures before significant and substantive changes were made to the Part 45 rules.

*C.     CME Rule 1001*

62.     On November 9, 2012, the day after filing its lawsuit against the CFTC, CME submitted to the Commission its request for expedited review and approval of a new Chapter 10 and Rule 1001 of CME's SDR Rulebook.

63.     Proposed CME Rule 1001 provided that all swaps cleared by CME's Clearing Division must be reported to CME's SDR.   The text of CME Rule 1001 is set forth in paragraph 14 of this Complaint.

64.     On November 28, 2012, CFTC noticed CME Rule 1001 for comment with a closing date for comments of December 21, 2012.

65.     As noted in paragraph 59 of this Complaint, that same day, the Commission unilaterally withdrew those elements of its October 11, 2012 FAQs, which had barred DCOs from requiring that swaps cleared by the DCOs be reported to their captive SDRs.

66.     On December 6, 2012, CME submitted a new version of CME Rule 1001 to the CFTC.  The Commission requested comments on this new version of CME Rule 1001.

67.     DTCC and DDR filed written comments in opposition to the CME rule, plus an expert report urging the CFTC to fully examine specified cost-benefit and anti-competitive issues before acting on CME Rule 1001.  Eleven other parties filed comments opposing the CME rule, and five (including CME and ICE) filed comments favoring the rule.

68.     Among the comments submitted were the following:

a.      "IECA questions the absence of any meaningful administrative procedures when the CFTC chose to delete [the statements in the FAQs] that [designated contract markets], [swap execution facilities] and DCOs that are also registered as SDRs may not require counterparties to use their 'captive' SDR for reporting swap transactions."   International Energy Credit Association (an association of several hundred energy company management professionals), Comment (Jan. 14, 2013) at 3.

b.      "The Proposed Rule would, in effect, frustrate the Commission's intent because it would permit the CME to achieve by a Commission approved DCO rule what it could not

achieve by Commission rule.  Since the Commission refused to grant the CME's request in the Reporting Release, we urge the Commission to refuse to permit it by means of a DCO rule instead."  The Global Foreign Exchange Division, Comment (Jan. 7, 2013) at 4.

      c.     "[W]e are concerned that the CFTC's sudden change of position with respect to anticompetitive tying arrangement would not only prevent JPMorgan and other similarly situated market participants from complying with the timelines set forth in the CFTC's Reporting Rules, it would create new costs and burdens in addition to increasing operational and systemic risks." JPMorgan Chase & Co., Comment (Jan. 11, 2013) at 11.

      d.     "[B]ecause the Proposed Rule provides that CME will report creation data for all swaps it clears to its own SDR, CME seeks to preclude a reporting counterparty from selecting the SDR to which the creation data is transmitted and instead require that such data be reported to its SDR, in direct contravention of Commission Regulations and guidance upon which market participants have relied . . . [I]t is also inconsistent with the release published in connection with the Commission's final Swap Data Recordkeeping and Reporting Requirements, which clearly indicates the Commission envisioned a regime in which reporting counterparties may opt to transmit swap data to SDRs other than the DCO's SDR."  Deutsche Bank, Comment (Jan. 7, 2013) at 3.

      D.    *CFTC's Approval of CME Rule 1001 and Adoption of It in Place of the FAQs*

      69.     On March 6, 2013, the CFTC issued an order approving CME Rule 1001 and declared that its approval of CME Rule 1001 and its accompanying statement "supersede[]" the FAQs, to the extent they are inconsistent with approval of CME Rule 1001.

70.     The CFTC's account of its procedural history in its order approving CME Rule 1001 did not mention the complaint that CME filed against the Commission, or the circumstances that led to its dismissal.

E.      *ICE Rule 211 Certification*

71.     ICE Clear Credit, the world's largest clearinghouse for credit default swaps, is a wholly-owned subsidiary of ICE, a publicly traded company.   Through its numerous subsidiaries, ICE operates regulated futures exchanges, global over-the-counter markets and clearinghouses in North America and Europe.   One of ICE's subsidiaries, ICE Trade Vault, is a provisionally registered SDR.

72.     Shortly after approval of CME Rule 1001, ICE Clear Credit filed a submission, later amended, with the CFTC for self-certification pursuant to Commission Rule 40.6 of proposed new ICE Rule 211, a rule that, like CME Rule 1001, requires swaps cleared by ICE to be reported to ICE's captive SDR.

73.     DTCC and DDR objected to certification of ICE Clear Credit's rule because of its anti-competitive effects, noting that the Commission had not conducted any analysis of ICE's market share.   DTCC and DDR filed a petition asking the CFTC to deny certification and open proceedings to address the anti-competitive and other violations of the Commodity Exchange Act and Administrative Procedure Act.

74.     The Commission did not do so, thus denying by inaction DTCC's and DDR's petition.

75.     On April 25, 2013, the Commission's website reflected the status of ICE Rule 211 as "certified." (A copy is attached as Annex C.)

### III.     DTCC AND DDR HAVE BEEN HARMED BY THE COMMISSION'S ACTIONS

76.     DDR and DTCC have invested millions of dollars, plus time and effort to create and register as an SDR, and to build an SDR system to provide market participants with an effective vehicle for purposes of complying with applicable Commission rules governing the regulatory reporting of swaps.

77.     DDR's and DTCC's investment in and establishment of an SDR were made in reliance on the rules and regulatory framework that the CFTC had promulgated and disseminated to the public pursuant to Dodd-Frank's amendments to the Commodity Exchange Act.

78.     DDR's market participant-owners invested substantial resources to build reporting infrastructure to DDR.  The Commission's actions will cause them to incur unnecessary costs and burdens.  Comment letters stated, for example, that:

a.     "[V]arious market participants have expended significant time and expense toward designing and establishing information technology systems and infrastructure to comply with the rules for swap data reporting promulgated by the CFTC as well as foreign regulators. These efforts were undertaken on the assumption that the Commission would not permit DCOs to create anti-competitive standards such as [CME Rule 1001]."  The Global Foreign Exchange Division, Comment (Jan. 7, 2013) at 2.

b.     "Anticompetitive tying arrangements such as CME's proposed Rule 1001 in practice would force a reporting counterparty to report its required swap continuation data for all cleared swaps to a DCO's affiliated and captive SDR notwithstanding the fact that the reporting counterparty may choose to submit [primary economic terms] data to its chosen SDR.  These arrangements would require JPMorgan and other market participants to invest significant

amounts of additional time and money (on top of what is already in place and has been spent) to establish connectivity to CME."  JPMorgan Chase & Co., Comment (Jan. 11, 2013) at 9-10.

c.      "Since Citi and other market participants have already undergone the cost-intensive process of selecting and establishing connectivity with their chosen SDR, [CME Rule 1001] would create significant duplicative burdens and additional issues, without countervailing benefits . . . Citi has chosen to utilize DTCC as its SDR and as a result has built the necessary real time connectivity to support reporting to DTCC's SDR."  Citigroup, Inc., Comment (Jan. 14, 2013) at 2.

79.      On October 31, 2011, DDR submitted an application for SDR registration, which the CFTC provisionally approved on September 19, 2012.

80.      DDR is the only provisionally-registered SDR with no DCO affiliation.  Further, DDR is the only SDR provisionally registered to receive data for all five swap asset classes. DDR competes with CME and ICE to be the SDR chosen by the relevant market participants to be utilized for the purposes of complying with applicable Commission rules governing the regulatory reporting of swaps.

81.      On October 12, 2012, DDR began to receive trades from market participants pursuant to the Part 45 rules.

82.      The CFTC's withdrawal of the FAQs, approval of CME Rule 1001, and the ICE Rule 211 certification have directly affected and injured, continue to affect and injure, and will continue to cause additional injury to DDR and DTCC and their investment in an SDR, and to their market participant-owners.  Because of the CFTC's actions, market participants can no longer exercise their choice and use DDR as their official SDR to fulfill their regulatory swap

data reporting obligations for swap transactions cleared on CME, ICE, and other DCOs that might adopt a rule similar to CME Rule 1001 or ICE Rule 211.

83.     DTCC and DDR operate as cooperatives.  The CFTC's withdrawal of the FAQs, approval of CME Rule 1001, and the ICE Rule 211 certification have directly affected and injured, continue to directly affect and injure, and will continue to cause additional injury to DTCC's market participant-owners by causing them to develop duplicative infrastructure for CME's SDR, ICE's SDR, and others.

84.     DDR and DTCC requested the Commission to conduct full notice and comment rulemaking proceedings under the Administrative Procedure Act and to prepare cost-benefit analyses for the withdrawal of the FAQs and the review of CME Rule 1001 and ICE Rule 211. The Commission denied these requests by inaction, thus violating the DTCC's and DDR's right to participate in such proceedings and their right to receive the requisite Commission statements required by the Administrative Procedure Act and the Commodity Exchange Act.

85.     The Commission's approval of CME Rule 1001 also injures the public interest, as commenters predicted:

a.     "Beyond imposing additional costs on individual [swap dealers] and other market participants, the duplication and fragmentation of swap data that would result from [CME Rule 1001] have the potential to create significant systemic risk to the market as a whole."  Citigroup, Inc., Comment (Jan. 14, 2013) at 4.

b.     "A fragmented SDR environment would undermine the efforts of regulators and market participants to achieve global harmonization and standardization across regulatory reporting and transparency regimes in recent years, leaving foreign regulators with inadequate access to necessary swap data.  Moreover, the approval of [CME Rule 1001] could create a

perception that the Commission is engaged in protectionism of local infrastructure providers, which could incite retaliatory measures from foreign regulators and detract from efforts to enhance international coordination." Deutsche Bank, Comment (Jan. 7, 2013) at 6.

86.     Unless the CFTC's approval is declared unlawful and vacated, CME and other entities such as ICE, which have adopted or will adopt similar rules, will be allowed to direct regulatory reporting data to their captive SDRs and away from DDR regardless of how swaps dealers, major swap participants, end users, and other registered entities choose to direct the data.

87.     The harm alleged in paragraphs 77 to 86 of this Complaint would be redressed by a favorable decision and a judgment setting aside the CFTC's actions.

## COUNT ONE

### (Withdrawal of FAQs in Violation of the Administrative Procedure Act and Commodity Exchange Act)

88.     DDR and DTCC incorporate by reference the allegations of the preceding paragraphs.

89.     The CFTC's actions to amend its rules began with the withdrawal of the FAQs after CME filed its lawsuit against the Commission.  The Commission withdrew the FAQs without notice, request for comments or explanation, and declared that those FAQs were superseded by its approval of CME Rule 1001.  These actions violated the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706.

90.     The Commodity Exchange Act requires a cost-benefit analysis as a component of a rulemaking.  The CFTC's failure to conduct a cost-benefit analysis before amending the FAQs in November 2012 and superseding it on March 6, 2013 violated the Commodity Exchange Act, 7 U.S.C. § 19(a).

91.     The CFTC's abrupt amendment of its FAQs, in a manner contrary to the Commodity Exchange Act, the CFTC's final rules, and the CFTC's other public guidance, without notice, request for comments, or explanation, was arbitrary and capricious and otherwise contrary to law, was without observance of procedure required by law, and thus in violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706.

## COUNT TWO

### (Approval of CME Rule in Violation of the Administrative Procedure Act and Commodity Exchange Act)

92.     DDR and DTCC incorporate by reference the allegations of the preceding paragraphs.

93.     The Commission's approval of CME Rule 1001 was arbitrary and capricious and otherwise contrary to law and without observance of procedure required by law because, among other reasons, it—

a.      Ignored the requirements of the Administrative Procedure Act and the Commodity Exchange Act;

b.      Failed to address key elements of the Commodity Exchange Act's pro-competitive provisions, wrongly defined the relevant markets, and failed to consider available market data;

c.      Did not conduct a cost-benefit analysis, as required by the Commodity Exchange Act; and

d.      Was a step in the sudden switch in swap data reporting rules, which began after CME filed a complaint against the Commission.

94.     The Commission's approval of CME Rule 1001 violated the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706, and the Commodity Exchange Act, including 7 U.S.C. §§ 7a-1(c)(2)(N), 19(b), 24a(f).

## COUNT THREE

**(Inconsistency of Approval of CME Rule 1001 with Commodity Exchange Act and CFTC Rules)**

95.     DDR and DTCC incorporate by reference the allegations of the preceding paragraphs.

96.     On January 13, 2012, the CFTC adopted the Part 45 rules regarding the Commodity Exchange Act's swap data reporting requirement after providing notice and an opportunity to comment.  The rulemaking process that preceded the final Part 45 rules included a detailed cost-benefit analysis of the rules as required by the Commodity Exchange Act, 7 U.S.C. § 19(a).

97.     On October 11, 2012, the CFTC issued FAQs regarding the reporting of cleared swaps and the operation of the single SDR rule, prohibiting the anti-competitive practice of allowing CME and other DCOs to require data for swaps cleared by such DCOs to be reported to captive SDRs.

98.     On March 6, 2013, the CFTC approved CME Rule 1001, even though it is inconsistent with the Commodity Exchange Act and CFTC's rules regarding SDRs.

99.     The CFTC's approval of CME Rule 1001, therefore, violates the Commodity Exchange Act, including 7 U.S.C. § 7a-2(c)(5)(A).

## COUNT FOUR

**(Certification of ICE Rule 211 in Violation of the Administrative Procedure Act and Commodity Exchange Act)**

100.     DDR and DTCC incorporate by reference the allegations of the preceding paragraphs.

101.     The Commission's  approval by inaction of the self-certification of ICE Rule 211 and its denial by inaction of DTCC's and DDR's petition were arbitrary and capricious and otherwise contrary to law and without observance of procedure required by law because, among other reasons, it—

a.     Ignored the petition of DTCC and DDR requesting the Commission to deny certification and open proceedings to address the anti-competitive and other violations of the Commodity Exchange Act by ICE Rule 211;

b.     Wrongfully proceeded under the self-certification procedures of Commission Rule 40.6;

c.     Ignored the requirements of the Administrative Procedure Act and the Commodity Exchange Act;

d.     Failed to address key elements of the Commodity Exchange Act's pro-competitive provisions, wrongly defined the relevant markets, and failed to consider available market data showing ICE to have market power and a large share of certain markets; and

e.     Did not conduct a cost-benefit analysis, as required by the Commodity Exchange Act.

102.     The Commission's actions and failure to act regarding ICE Rule 211 violated the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706, and the Commodity Exchange Act, including 7 U.S.C. §§ 7a-1(c)(2)(N), 19(b), 24a(f).

## COUNT FIVE

**(Inconsistency of ICE Rule 211 Certification with Commodity Exchange Act
and CFTC Rules)**

103.    DDR and DTCC incorporate by reference the allegations of the preceding paragraphs.

104.    On January 13, 2012, the CFTC adopted the Part 45 rules regarding the Commodity Exchange Act's swap data reporting requirement after providing notice and an opportunity to comment.  The rulemaking process that preceded the final Part 45 rules included a detailed cost-benefit analysis of the rules, as required by the Commodity Exchange Act, 7 U.S.C. § 19(a).

105.    On October 11, 2012, the CFTC issued FAQs regarding the reporting of cleared swaps and the operation of the single SDR rule, prohibiting the anti-competitive practice of allowing ICE and other DCOs to require data for swaps cleared by such DCOs to be reported to captive SDRs.

106.    On April 25, 2013, the CFTC approved by inaction the self-certification of ICE Rule 211, even though it is inconsistent with the Commodity Exchange Act and CFTC's rules regarding SDRs.

107.    The CFTC's actions and failure to act regarding ICE Rule 211, therefore, violates the Commodity Exchange Act, including 7 U.S.C. § 7a-2(c)(5)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request an order and judgment:

a.      Declaring that the CFTC's actions approving CME Rule 1001 and the ICE Rule 211 certification violate the Administrative Procedure Act and the Commodity Exchange Act, and are null and void;

b.      Declaring that CFTC's changes to the Part 45 rules by summarily withdrawing its October 11, 2012 FAQs and then approving CME Rule 1001 to expressly supersede the withdrawn FAQs violate the Administrative Procedure Act and the Commodity Exchange Act, and are therefore null and void;

c.      Declaring that CME Rule 1001 and ICE Rule 211 are inconsistent with the Commodity Exchange Act and CFTC regulations, and are null and void;

d.      Vacating and setting aside the Commission's withdrawal of the FAQs, its approval of CME Rule 1001, and the ICE Rule 211 certification;

e.      Reinstating the FAQs as issued on October 11, 2012;

f.      Awarding Plaintiffs their reasonable costs incurred in bringing this action; and

g.      Granting such other and further relief as this Court deems just and proper.

Dated: May 2, 2013

Respectfully submitted,

John Oberdorfer (D.C. Bar # 145714)
Andrew Friedman (D.C. Bar # 462131)
Samantha Petrich (D.C. Bar #502471)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC  20037
P: 202.457.6000
F: 202.457.6315
joberdorfer@pattonboggs.com
afriedman@pattonboggs.com
spetrich@pattonboggs.com

Counsel for DTCC Data Repository (U.S.) LLC and
The Depository Trust & Clearing Corporation