UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DTCC DATA REPOSITORY (U.S.) LLC, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 13-0624 (ABJ) |
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

The financial crisis of 2007 and 2008 has been widely attributed to the lack of regulation of certain derivatives markets, including the swaps market. Responding to that crisis, in 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which established oversight for previously unregulated markets. Dodd-Frank granted the United States Commodity Futures Trading Commission ("CFTC" or "Commission") exclusive jurisdiction over the regulation of swaps, the type of derivative at issue in this case. The Commission, in turn, has promulgated new regulations establishing a framework for the oversight of swaps that will reduce risk and promote transparency, in line with the goals of Dodd-Frank.

Plaintiffs, The Depository Trust & Clearing Corporation ("DTCC") and DTCC Data Repository (U.S.) LLC ("DDR"), challenge three separate but interrelated actions taken by the Commission, all of which relate to the Commission's new requirements for swaps. Defendants have moved to dismiss all but one count of the amended complaint. The Court will grant

defendant's motion to dismiss Counts I, IV, and V because these counts do not allege any final agency action that is reviewable by this Court, and therefore fail to state a claim. The Court does not find, however, that Count III duplicates Count II, as defendants claim, and so it will deny the motion to dismiss Count III. Defendants do not seek to dismiss Count II.

## I. Factual Background

### A. *Dodd-Frank and Swaps Regulation*

A swap is a type of derivative that generally consists of an "agreement, contract, or transaction" between parties that is based on the value of an underlying asset or event. *See* 7 U.S.C. § 1a(47)(A) (2012). Until 2010, the Commission was precluded from regulating most swaps by its own policies and by Congressional mandate. *See* 54 Fed. Reg. 30,694 (July 21, 1989) (Commission policy statement); Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000). Then, in the wake of the financial crisis, Congress amended the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("CEA"), through the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), and established an oversight and reporting regime for swaps. Congress vested authority to implement that regime in the Commission. 7 U.S.C. § 2(a)(1)(A).

Dodd-Frank requires that most swaps be "cleared" by a derivatives clearing organization ("DCO"). 7 U.S.C. § 2(h). DCOs are regulated by the Commission. *See* 17 C.F.R. § 39.11 (2013). In the clearing process, a DCO substitutes its own credit for the credit of the original parties to a swap, thereby reducing risk and assuring the financial integrity of a swap transaction. *See* 7 U.S.C. § 1a(15)(A). To that end, the Commission requires DCOs to maintain significant financial resources. 17 C.F.R. § 39.11(a). The Commission also oversees DCOs in a variety of other ways, including by requiring them to submit changes to their internal rules for review. *See*

17 C.F.R. § 40.5 (voluntary submission of rules for Commission review and approval); *id.* § 40.6 (self-certification of rules).

Dodd-Frank also requires that data about swaps be reported to new entities called "registered swap data repositories" ("SDRs"), which are also regulated by the Commission. 7 U.S.C. §§ 2(a)(13)(G), 24a. This reporting requirement is intended to increase transparency by providing data both to the public and to regulators. *See* 17 C.F.R. §§ 43, 45. The data to be reported includes data about the creation and confirmation of swaps. *See* 77 Fed. Reg. 2136 (Jan. 13, 2012). It also includes "continuation" data, which encompasses any changes made to the terms of a swap over its lifetime, including clearance by a DCO. *Id.*

   B. *Plaintiffs' Claims*

Plaintiff DDR is a provisionally registered swap data repository, or SDR, and a wholly-owned, indirect subsidiary of plaintiff DTCC, which "provides critical infrastructure to serve participants in the financial industry." Am. Compl. ¶¶ 24–25. According to the amended complaint, plaintiff DDR is the only SDR that is not affiliated with a derivatives clearing organization, or DCO. *Id.* ¶ 80.

This litigation centers on the question of whether it is lawful for the Commission to permit DCOs to require that cleared swap data be reported to their affiliated, or "captive," SDRs. Plaintiffs believe that the Commission has violated the letter and spirit of Dodd-Frank and its own regulations by failing to prohibit what they characterize as "anticompetitive tying arrangements" between DCOs and their captive SDRs. *Id.* ¶ 78(b). Plaintiffs allege that these arrangements elbow any independent SDRs (that is, plaintiff DDR) out of the marketplace and reduce market participant choice. *Id.* ¶ 81. Plaintiffs also claim that permitting DCOs to require that cleared swap data be reported to their affiliated SDRs injures the public interest by imposing

increased costs on market participants and by causing "duplication and fragmentation of swap data" that "[has] the potential to create significant systemic risk to the market as a whole." *Id.* ¶ 85–85(a) (citation and internal quotation marks omitted). Finally, plaintiffs allege that the Commission has unlawfully reversed course, and that until November 2012, it had clearly expressed that it would not permit DCOs to require that cleared swap data be reported to their captive SDRs. *Id.* ¶ 47.

Plaintiffs allege that the CFTC violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Commodity Exchange Act in three separate ways in connection with its regulation of swaps. First, in Count I, plaintiffs challenge the revisions of the Commission's published answers to Frequently Asked Questions ("FAQs") that originally indicated that DCOs would be prohibited from requiring that cleared swaps data be reported to their captive SDRs. Am. Compl. ¶¶ 88–91; *id*. Annex A at 3 [Dkt. # 15-1] ("FAQs"). The three FAQs in question were withdrawn on November 28, 2012.[1] FAQs at 1. Plaintiffs claim that the withdrawal of the FAQs was the first step in the Commission's reversal of its position regarding the relationship between DCOs and SDRs. Am. Compl. ¶ 89.

Second, in Counts II and III, plaintiffs object to the Commission's approval of a new rule submitted by a DCO, the Chicago Mercantile Exchange, Inc. ("CME"), that would require that cleared swaps be reported to CME's captive SDR. *Id.* ¶¶ 82, 92–99. CME is a wholly-owned subsidiary of the CME Group, a prominent derivatives marketplace. *Id.* ¶ 48. After a notice and comment period that included participation by plaintiffs, the Commission approved a new

---

1   Plaintiffs characterize the withdrawal of the FAQs as an action of the Commission itself, but the Commission insists that the withdrawal was a decision made by its staff, Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss Counts One, Three, Four, & Five at 17 [Dkt. # 17-1] ("Def.'s Mem.").

Chapter 10 and Rule 1001 of CME's SDR Rulebook on March 6, 2013. Commission Letter, Am. Compl. Annex B at 1 [Dkt. # 15-2] ("Commission Letter").

Third, in Counts IV and V, plaintiffs challenge the self-certification of a substantially similar rule by ICE Clear Credit ("ICE"), another DCO. Am. Compl. ¶¶ 100–107. According to plaintiffs, ICE is the world's largest clearinghouse for credit default swaps. *Id.* ¶ 71. On April 10, 2013, ICE followed a different procedure than that used by CME and submitted its amended Rule 211 to the Commission pursuant to the self-certification provisions of the Commodities Exchange Act, 7 U.S.C. § 7a-2(c)(2), and Commission rule 40.6, 17 C.F.R. § 40.6. Def.'s Mem. at 10. Under these provisions, if the Commission does not notify an entity within ten business days that it will stay the self-certification for further analysis or public comment, a rule becomes effective on the entity's self-certification alone. 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.6(b)–(c).

Like CME Rule 1001, ICE Rule 211 provides that all swaps cleared by ICE must be reported to ICE's SDR. Def.'s Mem. at 10; Am. Compl. ¶ 72. Plaintiffs petitioned the CFTC to stay ICE Rule 211, arguing that the rule would violate the CEA and APA. *Id.* ¶ 73. The Commission did not respond to plaintiffs' petitions and took no action with respect to the proposed rule, which was deemed certified on April 25, 2013. *Id*. ¶¶ 74–75; Def.'s Mem. at 10.

## II.   Defendant's Motion to Dismiss

The Commission has moved to dismiss Counts I, III, IV, and V of the Complaint. It argues, and the Court finds, that Counts I, IV, and V fail to state a claim upon which relief can be granted because they do not allege any final agency action. *See* 5 U.S.C. § 704 (provision of the APA providing for review of "final agency action"). The Commission asks the Court to dismiss Counts III and V on the grounds that Count III is duplicative of Count II, and that Count V is duplicative of Count IV. Def.'s Reply in Further Supp. of Its Mot. to Dismiss Counts One,

5

Three, Four, & Five at 14 [Dkt. # 21] ("Def.'s Reply"). Defendant's motion to dismiss Count V as duplicative will be denied as moot. Furthermore, the Court finds that Count III does not duplicate Count II – which defendant has not sought to dismiss – and so both Counts II and III will remain in the case.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276

(D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).

## ANALYSIS

**I. The withdrawal of three FAQs is not a reviewable final agency action.**

The Commission's withdrawal of three Frequently Asked Questions six weeks after issuing them is not a reviewable final agency action. *See* 5 U.S.C. § 704. At the outset, it is not clear that the withdrawal of the FAQs constitutes "agency action" at all, since "[a]n agency action is not final if it is only 'the ruling of a subordinate official,'" *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992), quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967). The FAQs plainly state that they reflect the views of Commission staff, not of the Commission itself. *See* FAQs at 5 ("However, Staff believes that . . . ."); *id.* at 7 ("Accordingly, Staff believes that . . . ."). And the Commission asserts that its staff, not the Commission, made the decision to withdraw the FAQs at issue here. *See* Commission Press Release, Am. Compl. Annex B at 1 [Dkt. # 15-2] ("Commission Press Release") (announcing that "Staff of the Commodity Futures Trading Commission" had withdrawn three FAQs). But the Court need not decide this issue because even if the withdrawal of FAQs could be considered an "agency action," it was not a "final" action, and therefore it is not reviewable. *See* 5 U.S.C. § 704.

To be final, an agency action must not be "tentative or interlocutory," and must "be [an action] from which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426 (D.C. Cir. 2004), quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see also Franklin*, 505 U.S. at 797 (stating that agency action is not final if it is merely "tentative," and if the agency has not yet "completed its decisionmaking process."). The withdrawal of the FAQs did not determine any rights or obligations, nor was it the culmination of a Commission decision-making process. Rather, the Commission or its staff withdrew the advice it had been posting online about a particular question, leaving that question open for later decision by the Commission.[2] Indeed, the Commission's subsequent approval of CME Rule 1001, which, as plaintiffs point out, expressly "supersede[d]" any prior conflicting guidance, underscores the fact that the withdrawal of the FAQs was not a final agency action. *See* Commission Statement at 3 ("To the extent that any guidance previously issued by the Commission Staff may be inconsistent with the Commission's determination herein with respect to CME Rule 1001, the Commission's determination supersedes any such prior Staff guidance.") The withdrawal of the FAQs was merely "tentative or interlocutory," and is therefore not final agency action subject to APA review. Thus, Count I fails to state a claim upon which relief can be granted, and the Court will grant defendant's motion to dismiss it.

In their opposition to defendant's motion to dismiss, plaintiffs attempt to clarify that they intended in Count I to challenge a "sequence of actions" that ultimately led to the Commission's

---

2  Plaintiffs assert that until the withdrawal of the FAQs, the Commission had "repeatedly affirmed" that it would not allow a DCO to require that data be reported to its captive SDR. Am. Compl. ¶ 47. Even if true, this would not transform the withdrawal of the FAQs into a final agency action, because the withdrawal, on its own, was not a repudiation of the Commission's alleged prior statements.

"superseding" of the withdrawn FAQs through approval of CME Rule 1001, and not solely the withdrawal of the FAQs. Pls.' Mem. of P. & A. in Opp. to Def.'s Mot. to Dismiss at 11–14 [Dkt. # 19] ("Pls.' Opp."). To the extent that was plaintiffs' intention, the Court's dismissal of Count I will not prevent plaintiffs from pressing that theory in connection with Count II. Defendants have not moved to dismiss Count II, which directly challenges CME Rule 1001, and which also incorporates all of the factual allegations that underlie Count I. *Compare* Am. Compl. ¶ 88, *with id.* ¶ 92. But to the extent plaintiffs challenge the withdrawal of the FAQs as an isolated incident, Count I must be dismissed.

## II. The self-certification of ICE Rule 211 is not a reviewable final agency action.

Counts IV and V challenge the Commission's tacit approval of ICE Rule 211. But that rule was approved by operation of law, and therefore the Court finds that Counts IV and V do not present any agency action or "failure to act" that would be subject to review under the APA. *See* 5 U.S.C. § 551(13). If Congress has "spelled out the legal effect" of agency inaction without articulating any limiting principle, that inaction is typically unreviewable. *See Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1132 (D.C. Cir. 2007); *Amador Cnty. v. Salazar*, 640 F.3d 373, 382 (D.C. Cir. 2011). Moreover, agency "inaction qualifies as 'failure to act' only where it is 'discrete.'" *Amador Cnty.*, 640 F.3d at 382, quoting *Norton v. S. Utah Wilderness Alliance ("SUWA")*, 542 U.S. 55, 62–64 (2004).

In *Sprint Nextel*, the D.C. Circuit found that a statutorily mandated consequence of agency inaction was not the sort of failure to act that is subject to AP.A review. *See* 508 F.3d at 1133. The case dealt with a provision of the Communications Act that required the Federal Communications Commission ("FCC") to forbear from applying certain regulatory requirements to broadband services if a service-provider's petition for forbearance met specific requirements.

508 F.3d at 1131; *see also* 47 U.S.C. § 160. In that case, the FCC had deadlocked in a 2-2 vote as to whether it would partially deny a forbearance petition by Verizon.[3] 508 F.3d at 1131. After the statutory deadline passed, the FCC issued a press release announcing that Verizon's petition had been "deemed granted by the operation of law." *Id.*

The court held that the granting of Verizon's forbearance petition was not a final agency action reviewable under the APA because "[i]n those instances in which the [FCC] does not deny a forbearance petition, Congress has spelled out the legal effect: the petition 'shall be deemed granted.'" *Id.* at 1132. In light of this explicit statutory language, the court found that "Congress, not the [FCC]," had granted Verizon's petition and, therefore, there was no final agency action to review. *Id.* The FCC "did nothing" and there was no "discrete" action to review. *Id.* at 1131. Moreover, the court found that any review would be without standards because there was no agency reasoning to assess, as there would have been had the FCC acted to grant or deny the petition. *Id.* at 1133. Although declining to review a "deemed granted" forbearance petition might allow the FCC to avoid judicial review through inaction, the court found that this was simply "the consequence of the system Congress mandated." *Id.*

In *Amador County*, by contrast, the D.C. Circuit held that the Secretary of Interior's "no-action approval" of an Indian gaming compact was a reviewable final agency action. 640 F.3d at 375. The Indian Gaming Regulatory Act ("IGRA") provided that "[i]f the Secretary does not approve or disapprove a compact . . . [within] 45 days . . . the compact shall be considered to have been approved by the Secretary, *but only to the extent the compact is consistent with the provisions of [the IGRA]*." 25 U.S.C. § 2710(d)(8)(C) (emphasis added). In that case, Amador County, California challenged the Secretary's no-action approval of a gaming compact that

---

3     At the time of the vote, one of the five FCC seats was vacant. *Sprint Nextel*, 408 F.3d at 1131 n.2.

10

affected tribal lands in the county. 640 F.3d at 375. The court held that the Secretary's inaction was reviewable and distinguished *Sprint Nextel*. *Id.* at 375, 382.

First, the court noted the "'strong presumption that Congress intends judicial review of administrative action.'" *Id.* at 379, quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). The court explained that, "[t]o overcome" that presumption, "we must find 'clear and convincing evidence of a contrary legislative intent.'" *Id.* at 380, quoting *Bowen*, 476 U.S. at 671–72. The court found that the statutory "caveat" that a compact would be deemed approved "only to the extent that the compact is consistent with the provisions of" the IGRA "invite[d] judicial review by setting out a clear standard for reviewing courts to apply." *Id.* Therefore, Congress did not clearly intend to preclude review of the Secretary's no-action decisions. *Id.*

In addition, the court concluded that, through the caveat, Congress had imposed a duty on the Secretary of the Interior to disapprove any compacts that would violate the IGRA. *Id.* at 381. "[J]ust as the Secretary has no authority to affirmatively approve a compact that violates any of [the IGRA's] criteria for disapproval," the court reasoned, "he may not allow a compact that violates [the IGRA's] caveat to go into effect by operation of law. *Id.*

The caveat distinguished *Amador County* from *Sprint Nextel*, where the court found no "discrete" inaction to review, and where Congress had "provided that if the FCC failed to act, a forbearance request would be granted by operation of law without limitation." *Id.* at 382. In the Indian Gaming Regulatory Act, on the other hand, the presence of the caveat created a "discrete agency action" for judicial review: "the Secretary's failure to disapprove the compact despite its inconsistency with the Act." *Id.* Moreover, although as in *Sprint Nextel*, there was no agency

11

reasoning to review, the *Amador County* court found that agency reasoning was not necessary to determine whether the compact met the requirements of the IGRA. *Id.*

Applying those principles here, the Court finds that since Congress has not articulated a limitation on the approval by operation of law of a rule like ICE Rule 211, there is no "discrete" agency action to review, and the self-certification of ICE Rule 211 is not a reviewable "failure to act." ICE Rule 211 was submitted to the CFTC pursuant to the CEA's self-certification provisions, 7 U.S.C. § 7a-2(c). The CEA provides:

> (1) "A registered entity may . . . elect to approve and implement any new rule or rule amendment, by providing to the Commission . . . a written certification that the . . . new rule, or rule amendment complies with this chapter (including regulations under this chapter)."
>
> (2) "The new rule or rule amendment described in paragraph (1) shall become effective . . . on the date that is 10 business days after the date on which the Commission receives the certification . . . unless the Commission notifies the registered entity within such time that it is staying the certification because there exist[s] . . . a potential inconsistency with [the CEA] (including regulations under [the CEA])."

*Id.*

Plaintiffs urge the Court to conclude that the approval by operation of law of ICE Rule 211 constitutes reviewable agency inaction under the APA. Pls.' Opp. at 18. They note that the CEA provides that a self-certified rule or rule amendment "shall become effective" after ten business days "unless" the Commission stays the certification for specified reasons, including "a potential inconsistency with [the CEA]." Pls.' Opp. at 20–21; 7 U.S.C. § 7a-2(c). Likewise, Commission rule 40.6 provides that the Commission "may stay the certification of a new rule or rule amendment" on several grounds, including that it "is potentially inconsistent with the Act." 17 C.F.R. § 40.6(c)(1). Plaintiffs argue that this language is comparable to the "caveat" in

12

*Amador County*, which led the court to conclude that judicial review was appropriate in that case. Pls.' Opp. at 20–21.

But the court in *Amador County* found that judicial review of a no-action approval was appropriate because of the "duty" it determined Congress had placed on the Secretary to disapprove compacts that conflicted with the IGRA. 640 F.3d at 381, 383. The court discerned this duty from the statutory requirement that compacts under the IGRA would be deemed approved "only to the extent" they were consistent with the IGRA itself. *Id*. at 381. The CEA, by contrast, imposes no such duty. The CEA provides that the self-certification becomes effective "unless" the Commission chooses to act. The Commission rule similarly provides only that the Commission "may" issue a stay under certain circumstances. This permissive language stands in contrast to the Congressionally-imposed mandate the *Amador County* court found in the IGRA. As in *Sprint Nextel*, all the CEA and the Commission rules provide is that the Commission *could* block an unlawful rule change – but not that it *must*. Moreover, the brief ten-day review period Congress supplied in the CEA further supports the conclusion that Congress did not intend to impose a duty on the Commission to do a searching review of every rule or rule amendment that passes through the self-certification process.

In addition, there is no "discrete" agency action here for the Court to review. *See Norton*, 542 U.S. at 62–64. As in *Sprint Nextel*, there is no agency decision, reasoning, or record for the Court to assess. 508 F.3d at 1133. And while the IGRA specifically provided that a compact approved by inaction "shall be considered to have been approved by the Secretary," *Amador Cnty.*, 640 F.3d at 375, there is no similar language in the CEA that provides standards for judicial review or transforms a regulated entity's rule change into an action of the Commission. Indeed, the CEA does not even require registered entities to "petition" the Commission to make a

decision, unlike the petition for forbearance at issue in *Sprint Nextel*. *See* 508 F.3d at 1131. Rather, here, registered entities may simply "elect" to amend or add to their own rules, and their rule changes "shall become effective" absent intervention by the Commission. 7 U.S.C. § 7a-2(c). Thus, a self-certified rule change under section 7a-2(c) of the CEA is not "granted" by the Commission. There is no "discrete" agency action to review under these circumstances.

The Court therefore concludes that the approval by operation of law of ICE Rule 211 is not a final agency action subject to review under the APA. Plaintiffs therefore fail to state a claim upon which relief can be granted, and Counts IV and V must be dismissed.

### III. Count III is not duplicative of Count II.

Defendants ask the Court to dismiss Count III on the grounds that it duplicates Count II.[4] A court may dismiss duplicative claims in its discretion. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010) (stating that, "[a]s a matter of judicial economy, courts should dismiss" duplicative claims). Claims are duplicative when they "stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." *Id.* at 81.

In Count II, plaintiffs contend that the Commission's approval of CME Rule 1001 violated sections 553 and 701–706 of the APA, and three sections of the CEA relating to antitrust laws and considerations: sections 7a-1(c)(2)(N), 19(b), and 24a(f). Am. Compl. ¶ 94. In Count III, plaintiffs claim that the Commission's approval of CME Rule 1001 violated the same sections of the APA, as well as section 7a-2(c)(5)(A) of the CEA, which governs the Commission's approval of new rules. Am. Compl. ¶ 99. The Court finds that the different legal

---

4   Defendant's request that the Court deny Count V as duplicative of Count IV will be denied as moot, as the Court will dismiss both Counts IV and V for the reasons stated *supra* in Analysis section II.

theories advanced in Counts II and III do not constitute "identical allegations," and therefore it will deny defendant's motion to dismiss Count III as duplicative of Count II.

## CONCLUSION

The Court will grant defendant's motion to dismiss Counts I, IV, and V for failure to state a claim because plaintiffs have failed to allege any final agency action that would be reviewable under the APA. The Court will deny defendant's motion to dismiss Count III because it advances a unique legal theory and is not duplicative of Count II. Defendants do not challenge Count II in this motion, and so Counts II and III will remain in this case.

_____
AMY BERMAN JACKSON
United States District Judge

DATE: March 10, 2014